**STATE of Missouri, Plaintiff–Respondent,**

v.

**Leslie D. NAASZ, Defendant–Appellant.**

**No. 25712.**

Missouri Court of Appeals, Southern District, Division One.

July 22, 2004.

Motion for Rehearing or Transfer Denied Aug. 13, 2004.

Application for Transfer Denied Sept. 28, 2004.

Kent Denzel, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Linda Lemke, Assistant Attorney General, Jefferson City, for respondent.

PHILLIP R. GARRISON, Judge.

A jury found Leslie D. Naasz ("Appellant") guilty of the following crimes against his daughter, S.N.: Count I, sexual assault in violation of Section 566.040;[1] Count II, incest in violation of Section 568.020; Count III, statutory rape in the second degree in violation of Section 566.034; Count IV, incest in violation of Section 568.020; Count V, statutory rape in the second degree in violation of Section 566.034; and, Count VI, incest in violation of Section 568.020.[2] He was sentenced to seven years imprisonment on Counts I, III, and V, and five years imprisonment on Counts II, IV, and VI.[3] Appellant was also

---

1. All references to statutes are to RSMo (2000) unless otherwise indicated.

2. Counts I and II were for events which occurred between August 1, 2000, and August 31, 2000; Counts III and IV were for events which occurred between April 1, 1996, and

July 30, 1996; and, Counts V and VI were for events which occurred between October 1, 1996, and November 30, 1996.

3. Appellant was sentenced to serve Counts II, IV, and VI concurrent to each other and consecutive to Count I and to serve Counts III

fined $500 for each conviction. Appellant alleges three points of trial court error.

We review the evidence presented at trial in a light most favorable to the verdict. *State v. Hall,* 982 S.W.2d 675, 680 (Mo. banc 1998). The record reveals that Appellant and his wife, P.N., had two daughters, B.N., who was born on May 18, 1979, and S.N., who was born on April 15, 1981.[4] When S.N. was three years old, P.N. attended nursing school during the day and Appellant worked nights so that he could care for the children while P.N. was in class. When B.N. started kindergarten, Appellant and S.N. were alone for the majority of the day. It was at this time that Appellant began to sexually abuse S.N. According to S.N., Appellant would dress in women's clothing, such as robes, nightgowns, and high heels, and hold her on his lap while he masturbated. This progressed until Appellant began to ask her "to touch him like on his penis" and he would touch her "private areas." Additionally, Appellant would touch S.N.'s genitals over her clothes while they were in the car or in public places; he would make her rub his penis until he ejaculated; he would rub her vagina and clitoris; he would bathe with her; and, he would kiss and fondle her. Appellant told S.N. "that this was the way [ ] he loved [her]." According to S.N., at that time she "didn't really see it as wrong."

When S.N. was six years old, the family moved to a new house and S.N. had her own bedroom. At the new house, Appellant would "come into [her] room [at night] and do things," but the majority of the sexual abuse occurred during the day when P.N. was at work or when they were alone. Appellant read S.N. passages from the Bible that discussed incestuous rela-

tionships and would often touch her private areas when she said her nightly prayers. Appellant continued to dress in women's clothing and to masturbate in front of S.N.; however, he also began to insert his fingers and other objects into S.N.'s vagina, including pens, pencils, and screwdrivers. Appellant explained more about sex and sexual terminology to S.N. and showed her how to touch herself. He told S.N. that she shouldn't tell anyone about their "special love," because if P.N. found out she would be very hurt and people would not understand their special relationship.

In January of 1991, when S.N. was nine years old, Appellant was deployed to Saudi Arabia as part of Operation Desert Storm. When Appellant returned, he continued to abuse S.N. in the same manner, but her attitude toward him had changed. She no longer wanted him to be there and she testified at trial that she hated him and wished he would go back to Saudi Arabia. S.N. began spending as much time as possible at a friend's house and spent almost every weekend away from home. After observing her friend's family, S.N. realized that her relationship with Appellant was not normal.

When S.N. was twelve, P.N. was hospitalized for severe depression and suicidal tendencies. One evening while P.N. was in the hospital, S.N. walked in on Appellant while he was wearing P.N.'s clothing and masturbating with a pillow, which he had dressed in S.N.'s bathing suit. Appellant told S.N. to "come here." When she wouldn't approach him, he grabbed her and tried to force her underneath him, but she was able to pull away and run to her friend's house. When she returned home, Appellant told her to never fight him

and V concurrent to each other, but consecutive to Counts I, II, IV, and VI.

**4.** At the time of trial, S.N. was twenty-one years old.

again, because "sex will never hurt as much" as what he could do to her.

The following month P.N. was readmitted to the hospital and was once again away from home for a period of time. One night Appellant "came in [S.N.'s] room and [they] had sex the first time." According to S.N., he brought a tube of lubricant to her and told her not to fight him. He explained that sex was normal and that she would probably like it. Thereafter, they got undressed below the waist, he rubbed her genitals, and inserted his penis into her vagina. From that point on S.N. had sex with Appellant once or twice a month. S.N. testified that "[t]here was no like regular routine, it just had to do a lot with like how my mom was going, like emotionally and mentally.... And like for her sex hurt her and so I know there were times when my mom didn't want to have sex [with him]."

S.N. testified that she wanted the abuse to stop, but she felt at that time that was just how her life was and she "just accepted it." In April of 1996, S.N. missed her period. It wasn't until July that she informed Appellant that she might be pregnant. Appellant took S.N. to a local park where she performed a home pregnancy test. The test was positive and Appellant told her that they had some time to figure out what to do. That fall, S.N. did not want to return to public school and Appellant agreed that she could be home schooled.

Appellant and S.N. did not have intercourse again until October. One night, S.N. returned home to find Appellant angry about the family's financial situation. Appellant came into her room and told her that they were going to have sex; however, this time it was different. S.N. testified, "usually it's like we talk about it, you know, we talk about sexual stuff, we get in the mood, like we touch each other, and like it happens," but this time Appellant pushed into her stomach with his open hands, like he was kneading bread and he pressed down on her so hard she could not breathe. He forced his penis into her vagina so hard that she felt like she was being "knifed." She stated that she was in a great deal of pain and shock from the suddenness of the whole incident. When Appellant was finished, he left the room.

Later, S.N. was in so much pain that she was unable to sleep. Then she realized that she was bleeding from her vagina and repeatedly asked Appellant to take her to the hospital. Eventually Appellant led S.N. to the bathroom and had her sit in the bathtub. Due to the loss of blood and the pain, S.N. started passing in and out of consciousness. At one point, S.N. awoke to find Appellant sitting next to her with a spool of wire and she "remember[ed] like him sticking that [in her vagina], and then [she] passed out." When she regained consciousness "it was like this rush of like fluid and it was like the sac and the amniotic fluid was just coming out. And like I saw like the small baby like at my feet." The next time that S.N. revived, Appellant, the baby, and the bloody towels were gone and she was sitting in the bathtub alone. S.N. remained in the bathtub running the water over her until the water turned cold. S.N. then got out of the tub and got dressed. Later, when P.N. asked her what was wrong, S.N. told her that she started her period and did not feel well.

Appellant did not talk to S.N. for two months; however, one night in December of 1996, Appellant approached S.N. and told her that he wanted to start having sex with her again, but she was going to have to be more careful about determining when she was ovulating. Later that night, when P.N. picked S.N. up at church, S.N. told P.N. that she did not want to go home and that she was tired of everything that

went on there. S.N. later told P.N. that she was scared of Appellant because of his cross-dressing and she admitted that she had seen Appellant masturbate. S.N. stayed with a friend for several days thereafter. When she returned home, Appellant told her that he was trying to get right with God and that he would stop wearing women's clothing and would also stop abusing her.

For the next two years Appellant did not abuse S.N. However, in November of 1998, when she was a senior in high school, S.N. felt that things "started to like look like they were about ready to happen again." Sometimes S.N. would get up in the morning to find Appellant in the living room "dressed up," and other times "he'd be dressed up and try to do things, like just to try to grab at [her] and just kind of like masturbate in front of [her]." Afraid that "it [would] happen again," S.N. packed her things and moved in with a friend for the remainder of her senior year. Yet, on occasion, S.N. visited her parents house during her lunch hour or to change clothes after school and, according to S.N., "one day [Appellant] just approached me and I was like okay, I didn't really care. And we ended up having sex back in my back bedroom." S.N. testified that the reason she did not care was that, since she had moved out she felt that she "had more control over like when he could do stuff to me and when I didn't want it, and plus I could leave." S.N. stated that "by then because like all of the years of all of it happening, it was like that was just so—I felt like that's who I was." She enjoyed the sex, but afterwards she "felt really guilty." S.N. believed that she was expected to have sex with Appellant in exchange for his financial support. From November of 1998 when she moved out of the house until she left for college in August of 1999, Appellant had sex with S.N. four or five times.

In January of 2000, S.N. needed to have kidney surgery in Kansas City, Missouri. Two nights before her surgery, Appellant came into S.N.'s hotel room and "[h]e was just like, this is going to cost a lot of money ... [a]nd so like that, like he wanted to have sex and that was how I would pay him, or whatever. And I was like, okay, so we had sex that night." Appellant and S.N. had sex again in April of 2000 when S.N. was in town to visit a friend. Appellant called her at her friend's house and the two met in a park to have sex.

S.N. returned to Springfield after her freshman year of college and got an apartment by herself. In August of 2000, Appellant came to her apartment "[a]nd then he just kind of approached me and like he just come up to me and just kind of kissed on me and the next thing I know it was like we had sex." [5]

Several days later, S.N. told a close friend about the abuse and the two of them discussed the situation with S.N.'s pastor and made arrangements to go the police. However, due to the stress of the situation, instead of remaining in Springfield and going to the police, S.N. borrowed $20 from P.N. and moved to Oklahoma. She phoned P.N. that night and told her that Appellant had been having sex with her for the past seven years. S.N. returned to Springfield in January of 2001 and charges were subsequently filed against Appellant. At trial, Appellant denied ever having any type of sexual contact with S.N.

■ In his first point Appellant contends that the trial court erred in overruling his motion for judgment of acquittal because there was insufficient evidence

---

5. This encounter became Counts I and II of the information.

from which the jury could have reached a "subjective state of near certitude" regarding S.N.'s lack of consent to the sexual contact. He contends that based on S.N.'s testimony that she was an "equal partner" in her sexual encounters with Appellant, there was no evidence that she lacked capacity or was coerced into sexual activity. Based on the extensive record in this case, we disagree.

 In a jury-tried case, our review of a trial court's ruling on a motion for judgment of acquittal is whether or not the state has made a submissible case. *State v. Sensabaugh*, 9 S.W.3d 677, 679 (Mo.App. E.D.1999). In determining whether the evidence is sufficient to support the conviction, we accept as true all of the evidence favorable to the state, including all favorable inferences drawn from the evidence, and we disregard all evidence and inferences to the contrary. *State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc 1993). "An 'inference' is a conclusion drawn by reason from facts established by proof; 'a deduction or conclusion from facts or propositions known to be true.'" *State v. Foster*, 930 S.W.2d 62, 64 (Mo.App. E.D.1996) (quoting *Draper v. Louisville & N.R. Co.*, 348 Mo. 886, 156 S.W.2d 626, 630 (1941)). In considering whether the evidence is sufficient to support the jury's verdict, we must look to the elements of the crime and consider each in turn. *State v. Thomas*, 75 S.W.3d 788, 790 (Mo.App. E.D.2002). In

our review, we may not "supply missing evidence or give the state the benefit of unreasonable, speculative or forced inferences." *State v. Langdon*, 110 S.W.3d 807, 812 (Mo. banc 2003). We look to whether there was sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989). The reasonable doubt standard "impresses on the trier of fact the necessity of reaching a subjective state of certitude on the facts in issue." *State v. Pendergrass*, 726 S.W.2d 831, 835 (Mo. App. S.D.1987).

Here, Count I of the felony information filed against Appellant alleged that he sexually assaulted S.N., "on or between the 1st day of August, 2000, and the 31st day of August, 2000," and that he "had sexual intercourse with S.N., knowing that he did so without the consent of S.N."[6] At trial, the jury was instructed in Jury Instruction No. 5:

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or between August 1, 2000 and August 31, 2000, in the County of Greene, State of Missouri, the defendant had sexual intercourse with S.N., and

Second, that defendant did so without the consent of S.N., and

6. Section 589.015(2) states that "[t]he term 'sexual assault' shall include:"

(a) The acts of rape, forcible rape, statutory rape in the first degree, statutory rape in the second degree, sexual assault, sodomy, forcible sodomy, statutory sodomy in the first degree, statutory sodomy in the second degree, child molestation in the first degree, child molestation in the second degree, deviate sexual assault, sexual misconduct and sexual abuse, or attempts to commit any of the aforesaid, as these acts are defined in chapter 566, RSMo;

(b) The act of incest, as this act is defined in section 568.020, RSMo;

(c). The act of abuse of a child, as defined in subdivision (1) of subsection 1 of section 568.060, RSMo, which involves sexual contact, and as defined in subdivision (2) of subsection 1 of section 568.060, RSMo; and

(d) The act of use of a child in a sexual performance as defined in section 568.080, RSMo.

Third that defendant knew that he did not have the consent of S.N., then you will find the defendant guilty under Count I of sexual assault.

As used in this instruction consent or lack of consent may be expressed or implied. Assent does not constitute consent if

(a) It is given by a person who lacks the mental capacity to authorize the conduct charged to constitute the offense and such mental incapacity is manifest or known to the actor; or

(b) It is given by a person who by reason of youth, mental disease or defect, or intoxication, is manifestly unable or known by the actor to be unable to make a reasonable judgment as to the nature or harmfulness of the conduct charged to constitute the offense; or

(c) It is induced by force, duress, or deception.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.[7]

At trial, the State argued that Appellant's long-term abuse taught S.N. to be a "sexual victim" and that, even though S.N. was now an adult, the fact that the abuse occurred throughout her entire childhood made her unable to judge her conduct and properly consent as specified in subsection (b) above. Additionally, the State argued that S.N.'s belief that she had to have sex with Appellant in exchange for his continued financial support was the equivalent of duress under subsection (c).

Appellant would have this court, and more importantly the jury, believe that S.N. consented to the acts that occurred in August of 2000. In assessing S.N.'s testimony as true for the purposes of this appeal, as we must, we find that the evidence of Appellant's repeated abuse of S.N., coupled with force and duress, was sufficient to permit a finding of lack of consent. *See Hall*, 982 S.W.2d at 680. While we are mindful that the threats, duress, and coercive tactics employed by Appellant were cumulative, having occurred over a span of some sixteen years, it was clear from these facts that the trial court did not err in denying Appellant's motion for acquittal.

In *State v. Garner*, 103 S.W.3d 866 (Mo. App. S.D.2003), the defendant was charged with sexual misconduct under Section 566.083, a crime which requires a finding that the child had been coerced "to expose the child's genitals ..." *Id.* at 869. The term "coercion" was defined for the jury as "to compel by force or threat." *Id.* In *Garner*, the defendant told the victims that they "had to" undress and run the length of a trailer before they could do anything else. *Id.* When they would not comply, the defendant called them "chicken" until they agreed to remove their clothing. *Id.* at 868. The court in *Garner* noted that "courts have long recognized that force can occur without physicality."[8] *Id.* at 869. It cited with approval *People v. Knapp*, 244 Mich.App. 361, 369, 624 N.W.2d 227, 235 (2001), which stated that "'force or coercion is not limited to physical violence but is instead determined in light of all the circumstances.'" *Id.* at 869–870. Based on that premise, the *Garner* court found that "[t]he force or threat used to compel [the victims] to expose themselves was

---

7. The definition for "consent" contained in Jury Instruction No. 5 is found in Section 556.061.

8. The court in *Garner* went on to cite *Miranda v. Arizona*, 384 U.S. 436, 448, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), in support of its proposition that "coercion can be mental as well as physical." *Id.* at 869.

subtle and psychological but no less forceful than if Defendant had used physical violence." *Id.* at 870.

In the matter at hand, Appellant used psychological and emotional force to mold S.N. into a sexual victim. Appellant repeatedly informed S.N. that their relationship was "special" and told her that no one else would understand their "special love" for each other. He told her that P.N. would be "hurt" if she found out about it. He did everything in his power to warp S.N. into believing that sexual abuse was perfectly normal and that there was nothing wrong with a father having sexual intercourse with his child.

Further, there was actual force as well as threats of violence directed toward S.N. by Appellant. Lack of consent may be established by a showing of actual force or a showing that the victim submitted because of fear induced by violence or threats of violence. *State v. Berry,* 593 S.W.2d 254, 255 (Mo.App. S.D.1980).[9] "Intercourse which is not resisted because of fear is not consensual." *State v. Hannett,* 713 S.W.2d 267, 271 (Mo.App. W.D.1986).

The record is clear that Appellant sexually abused S.N. from roughly the time she was three years old until charges were filed when she was nineteen years old. Appellant specifically intended that his ongoing and repeated abuse would essentially lull S.N. into believing that their "special love" was normal. He threatened her with physical violence if she ever resisted having sex with him. S.N. even informed P.N. that she was scared of Appellant as far back as 1996, and repeatedly testified

at trial that she was scared of Appellant. During the time that S.N. was living in Appellant's home and, thus, unable to remove herself from his influence, he committed such atrocities as forcibly raping her while she was pregnant with his child and leaving her in the bathtub while he disposed of the fetus. When S.N. was older, she moved out of the house while still in high school in order to distance herself from Appellant; she moved to another state for a period of time; and, when she returned to the area, she got her own apartment instead of living with her family. S.N. testified that she felt she had no control over the situation with Appellant and that she could not refuse his sexual advances. Appellant led S.N. to believe that she was required to have sex with him in exchange for his paying for her kidney surgery and other financial obligations. S.N. clearly believed that she had no choice but to have sex with Appellant when he desired.· She knew no other way of life and felt that there was no other alternative. We cannot convict the trial court of error as alleged in this point. Point I is denied.

■ In his second point, Appellant contends that the trial court abused its discretion in allowing the State to introduce evidence of his cross-dressing to the jury. He asserts that "this evidence of uncharged misconduct was not probative of the offenses for which [Appellant] was being tried, or in the alternative its prejudicial effect outweighed any probative value; it was offered solely to portray [Appellant] as a man of bad character[.]"

9. *State v. Davis,* 557 S.W.2d 41, 43 (Mo.App. St.L.1977) (held that consent to intercourse induced by fear is no consent); *State v. Salkil,* 659 S.W.2d 330, 333 (Mo.App. W.D.1983) (held that victim's compliance with defendant's demands because of fear of physical injury was sufficient to prove lack of consent

and contact was non-consensual); and, *State v. Greer,* 616 S.W.2d 82, 83 (Mo.App. E.D. 1981) (held that there was no consent where the victim failed to resist due to fear generated by defendant's extremely forceful and aggressive behavior).

"A trial court has broad discretion in deciding whether to admit or exclude evidence at trial." *State v. Sales*, 58 S.W.3d 554, 558 (Mo.App. W.D.2001). "We will not disturb the trial court's ruling unless we find that it clearly abused its discretion." *Id.* "Such abuse of discretion occurs when the trial court's evidentiary ruling is clearly against the logic of the circumstances before the court, and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful deliberate consideration." *State v. Robinson*, 90 S.W.3d 547, 550 (Mo.App. S.D.2002). "Furthermore, in matters involving the admission of evidence, we review for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Harrison*, 24 S.W.3d 215, 218 (Mo.App. W.D.2000).

The general rule concerning the admission of evidence of uncharged crimes, wrongs, or acts is that evidence of prior uncharged misconduct is inadmissible for the purpose of showing the propensity of the defendant to commit such crimes. *State v. Harris*, 870 S.W.2d 798, 810 (Mo. banc 1994). However, exceptions to this rule exist. Evidence of prior misconduct of the defendant, although not admissible to show propensity, is admissible if the evidence is logically relevant, in that it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial. *State v. Sladek*, 835 S.W.2d 308, 311 (Mo. banc 1992). In addition, "evidence of uncharged crimes that are part of the circumstances or the sequence of events surrounding the offense charged may be admitted to present 'a complete and coherent picture of the events that transpired.'" *State v. Pennington*, 24 S.W.3d 185, 190 (Mo.App. W.D.2000) (quoting *Harris*, 870 S.W.2d at 810). "Evidence of other crimes should be

admitted under one of these exceptions only when the prejudicial effect of the evidence is outweighed by its probative value." *State v. Mallett*, 732 S.W.2d 527, 534 (Mo. banc 1987). The balancing of the effect and value of evidence rests within the sound discretion of the trial court. *State v. Shaw*, 636 S.W.2d 667, 672 (Mo. banc 1982).

"To invoke the rule of exclusion contended [ ] by [Appellant], there must be evidence that [Appellant] has committed, or has been accused of, charged with, convicted of, or ... definitely associated with another crime." *State v. Varvera*, 897 S.W.2d 198, 201 (Mo.App. S.D.1995). Of principal importance here is the fact that cross-dressing is not a crime in the State of Missouri, therefore it is impossible that evidence related to Appellant's cross-dressing "definitely associated" him with "another crime." *See Varvera*, 897 S.W.2d at 201. Even with that being said, there was significant testimony by S.N. that illustrated the relationship between Appellant's cross-dressing and the sexual abuse suffered by S.N. In fact, S.N. testified that most of the time that Appellant sexually abused her he was dressed in women's clothing. In her senior year of high school S.N. moved out of her family's house when her father started cross-dressing again solely because she knew he would once again start to abuse her. Further, Appellant himself admitted at trial that he masturbated while wearing women's clothing for his own "sexual gratification." The evidence of Appellant's cross-dressing bears on the principal issue in this case and is logically relevant to his sexual abuse of S.N. *See State v. Pagano*, 882 S.W.2d 326, 331 (Mo.App. S.D.1994). Point II is denied.

In his final point, Appellant contends that the trial court plainly erred in failing to *sua sponte* dismiss Counts IV and VI,

because both were barred by the statute of limitations. Appellant asserts that his constitutional rights were violated in that he was charged in January of 2002 with incest based on events that happened in 1996 and the three-year statute of limitations found in Section 556.036 bars such a prosecution.[10] Additionally, he states that Section 556.037 is not applicable to extend the statute of limitations for incest to ten years because "it is not included in Chapter 566, which defines all sexual offenses," and incest is considered to be a crime against the family under Chapter 568.[11]

■■■■ Appellant concedes that he failed to preserve this point at trial and, therefore, requests plain error review. *See State v. Vanzandt,* 809 S.W.2d 881, 882 (Mo.App. S.D.1991). To show plain error, Appellant must demonstrate that the trial court's error so substantially violated his rights that manifest injustice or a miscarriage of justice would result if the error were left uncorrected. *State v. Mead,* 105 S.W.3d 552, 556 (Mo.App. W.D.2003). If the error did not have a decisive effect on the jury's verdict, there has been no plain error. *State v. Stewart,* 997 S.W.2d 36, 41 (Mo.App. W.D.1999). Before conducting plain error review, a reviewing court must first determine whether the trial court's action would amount to manifest injustice, assuming the court's action was erroneous. *Mead,* 105 S.W.3d at 556. If not, then plain error review is inappropriate. *Id.*

■■■ Appellant argues that the term "sexual offense" as used in Section 556.037 means sexual offense as defined in chapter 566 and relies on *State v. Hyman,* 37 S.W.3d 384 (Mo.App. W.D.2001), for support. We disagree. In *Hyman,* the court refused to apply Section 556.037 to the crime of armed criminal action, because that crime is not by its own terms a sexual offense. *Id.* at 392. Here, Appellant is charged with incest, a crime that by its very definition requires "sexual intercourse." Section 568.020.1. It is clear from the record that Appellant had sexual intercourse with S.N. and that at the time of the offenses, between April 1, 1996 and November 30, 1996, S.N. was under the age of eighteen, thereby bringing the crime within the applicable statute of limitations found in Section 556.037. The language of the statute is plain on its face and therefore no construction of the statute is allowed. *State v. Davis,* 988 S.W.2d 68, 70 (Mo.App. W.D.1999). Appellant's argument is without merit. Point III is denied.

The judgment and sentence of the trial court is affirmed.

BARNEY, P.J., and PREWITT, J., concur.

**10.** Section 556.036, RSMo Cum.Supp. (2002), states in pertinent part:
 1. A prosecution for murder, forcible rape, attempted forcible rape, forcible sodomy, attempted forcible sodomy, or any class A felony may be commenced at any time.
 2. Except as otherwise provided in this section, prosecutions for other offenses must be commenced within the following periods of limitation:
 (1) For any felony, three years;

 (2) For any misdemeanor, one year;
 (3) For any infraction, six months.

**11.** Section 556.037 states:
 The provisions of section 556.036, to the contrary notwithstanding, prosecutions for unlawful sexual offenses involving a person eighteen years of age or under must be commenced within ten years after the victim reaches the age of eighteen.