STATE of Missouri, Respondent,

v.

Ray A. SLAUGHTER, Appellant.

No. WD 69991.

Missouri Court of Appeals,
Western District.

April 27, 2010.

Application for Transfer Denied
Aug. 31, 2010.

Susan L. Hogan, Kansas City, MO, for Appellant.

Jammie P. Rasmussen, Jefferson City, MO, for Respondent.

Before LISA WHITE HARDWICK, P.J., JAMES M. SMART, JR., and ALOK AHUJA, JJ.

JAMES M. SMART, JR., Judge.

Ray Slaughter appeals his conviction of one count of forcible rape and two counts of forcible sodomy. He complains on appeal that the court erred in allowing the victim to testify that she thought she saw a gun handle in the bedroom in which she was attacked. The judgment is affirmed.

## Facts

Ray Slaughter was charged as a prior offender with one count of forcible rape and two counts of forcible sodomy. The following evidence was adduced at his jury trial.

On or around June 7, 2000, Kelly Gabbert,[1] the victim, met Ray Slaughter on the street in her neighborhood. He informed her that his name was "Rayshawn." They exchanged phone numbers and called one another over the next few days. On June 10, 2000, Slaughter picked up Gabbert at around 6:00 p.m. They went to Slaughter's aunt's house. They sat outside on the porch, and then went inside to watch television. Slaughter made some romantic advances, but Gabbert informed him "it was not like that." Gabbert was unable to contact family to arrange a ride back to the house where she was staying. Slaughter told her a cab would come and get her, but the cab never showed up. At approximately 1:00 a.m., Slaughter ordered pizza and had it delivered.

After they ate, Gabbert told Slaughter she was sleepy. Slaughter showed her his cousin Erikka's room. She went in and lay on the bed. Slaughter did not stay there. She fell asleep by herself. At some point in the night she became aware that Slaughter was also sleeping in the same bed. She went back to sleep. She awoke around 6:00 a.m. to loud music and Slaughter's loud voice. He was saying

things like "I deserve it" and "You act like you don't want to give it to me." Slaughter proceeded to forcibly rape and sodomize Gabbert. Gabbert said the attack lasted fifteen minutes and that she was screaming loudly.

After the attack, while Slaughter was temporarily out of the room, Gabbert tried to call her cousin to come get her. She was upset, and trying to whisper, and did not know the address of Slaughter's aunt's house. She hung up when Slaughter started back to the bedroom. Slaughter acted as if nothing had happened, as if everything were fine. Slaughter agreed to call a cab to take Gabbert home. He got in the cab with her. Slaughter rode with her to her home. She was crying in the cab. Slaughter was asking her to call him again. When they arrived at the destination, and he again asked, she refused emphatically, saying that she would not call him, because he raped her. She ran into the house. Gabbert did not immediately report the attack to the police because there were warrants out for her arrest. She reported the attack at 3:00 or 4:00 p.m. that day and was examined by a sexual assault nurse examiner.

Police were unable to locate Slaughter because Gabbert only knew him as "Rayshawn." The case was reopened in October 2004 because of a new investigative lead. Police eventually located "Rayshawn" Slaughter, also known as Anthony Slater. Gabbert identified Slaughter as the man who assaulted her. DNA from Slaughter's buccal swab matched DNA on a vaginal swab taken from Gabbert the day she reported the rape.

Gabbert said Slaughter threatened her "not to tell" by talking to his friends on the phone about her. Gabbert did not see a weapon in Slaughter's hand at any time,

---

**1.** This opinion uses a substitute name for the victim ("Kelly Gabbert").

but after the assault, she observed the handle of a handgun under the "tip" of the bed on which she was assaulted.

Q   Did he ever have a weapon?

A I didn't ever see one in his hand.

Q   Did you ever see one at all?

A I had seen a gun up under the bed by the tip of the bed.  A handgun.  I don't know—

[counsel]:  Your Honor, may we approach.

(Whereupon, counsel approached the Bench and the following proceedings were had:)

[counsel]:  Your Honor, at this time I would like to renew my motion in limine to not allow any testimony about this person possibly seeing the tip of a gun. There's nothing that would link Mr. Slaughter to this gun, either actually or constructively possessing the gun and would assert that this line of testimony is uncharged misconduct and highly prejudicial.

THE COURT:  Any other response?

[prosecution]:  No, Your Honor.

THE COURT:  It is overruled.

[counsel]:  I would like to make it a continuing objection.

THE COURT:  Certainly.  A continuing objection on this issue all along.

[counsel]:  And to allow the testimony is a violation of Mr. Slaughter's Constitutional rights under the Fourteenth Amendment and the corresponding Missouri Constitutional amendment of process and a fair trial.

(Whereupon, the proceedings returned to open court.)

Q   Ms. [Gabbert], you were describing what you saw under—up under the bed, I think is what you said.  Can you tell us what you saw?

A   Something that looked like a gun. I don't know if it was real or fake.

Q   When did you see that?

A   That morning.

Q   Did you see that before this happened or after?

A After.

Q   Had there been any discussion about guns during your time that you had spent with him, with Rayshawn?

A   No, not at the house, but before we had got to the house, it was in the car and he was talking to his neighbor. I don't know, they were conversating [sic] about something and he was like, I ain't worried about nothing, I got my protection.

\*     \*     \*     \*     \*     \*

Q   You told us about a comment that was made and that was made in the car on the way to Rayshawn's house?

A   Yes.

Q   What did you take that, the nature of the comment, what did you conclude?

A   His protection being a gun.

Q   And what did you think then at that point?

A   Really nothing.

Q   Did you think later on that he did or did not have a gun or did you just not think about it?

A   After the sexual thing, I started thinking about the comment he had made in the car.

Q   How would you describe his emotional demeanor and behavior?

A   Aggressive.

The jury found Slaughter guilty.  He was sentenced to concurrent terms of fifteen years' imprisonment for rape and five years' imprisonment for each count of sodomy.

Slaughter appeals.

## Standard of Review

"The trial court has broad discretion to exclude or admit evidence at trial." *State v. Simmons*, 944 S.W.2d 165, 178 (Mo. banc 1997). "This Court will reverse only upon a showing of a clear abuse of discretion." *Id.* "Such abuse of discretion occurs when the trial court's evidentiary ruling is clearly against the logic of the circumstances before the court, and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful deliberate consideration." *State v. Naasz*, 142 S.W.3d 869, 878 (Mo.App.2004). "Furthermore, in matters involving the admission of evidence, we review for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *Id.*

## Analysis

■ Slaughter claims that the trial court abused its discretion in overruling his objection to Gabbert's testimony that she saw something that looked like the handle of a handgun by the "tip" of the bed sometime after the attack. His contention is solely that the evidence concerning a possible gun in the bedroom was inadmissible evidence of other crimes or uncharged misconduct. He says it was not logically or legally relevant to the crime with which he was charged because no weapon was used during the assault. Slaughter concludes that evidence of a possible gun had no probative value but had tremendous prejudicial effect because it was evidence of another crime.

If the gun *did* belong to Slaughter, he could have been guilty of an offense as a felon in possession of a firearm. But there was no evidence indicating that the gun, if it was a gun, was possessed or owned by Slaughter. The bedroom in question was not Slaughter's bedroom, although he did seem to have appropriated it for that night. *See, e.g., State v. Richardson*, 515 S.W.2d 571, 572–73 (Mo.1974) (noting that where the evidence demonstrated that the defendant used one gun in the charged crime, evidence of other weapons, without more, was not evidence of other crimes). There also was no evidence that the jury was aware of, or would have thought of the possibility, that Slaughter would be guilty of another crime (felon in possession) if he owned or possessed a firearm. The jury did not learn of Slaughter having any prior convictions until he testified, significantly later, when the convictions were introduced on the issue of credibility. The jury would have had to remember and associate the presence of a possible gun with Slaughter being a convicted felon, and would have to be aware of a restriction on his right to possess a gun, to conclude that Slaughter's possession of a gun was a crime. *See State v. Goudeau*, 85 S.W.3d 126, 130–31 (Mo.App.2002) (court not persuaded that the jury was aware that possession of a pellet gun in a park was a crime).

■ But even assuming, for argument's sake, that the evidence was evidence of another, uncharged crime, that fact does not mean it was error to admit it. "The general rule concerning the admission of evidence of uncharged crimes, wrongs, or acts is that evidence of prior uncharged misconduct is inadmissible for the purpose of showing the propensity of the defendant to commit such crimes." *Naasz*, 142 S.W.3d at 878. Evidence of uncharged conduct may, however, be admissible for other relevant purposes, including, among other things, "motive, intent, absence of mistake or accident, identity, or a common plan or scheme." *State v. Kelley*, 943 S.W.2d 354, 356–57 (Mo.App.1997). An additional well-recognized exception exists "for the admission of evidence of uncharged crimes that are

part of the circumstances or the sequence of events surrounding the offense charged." *Id.* at 357.

■■■ The State argues that the evidence of the gun was legally and logically relevant in that it supported the theory that the sexual contact took place as the result of forcible compulsion. While the State's argument is focused on trying to fit the evidence of the gun into a logical picture (which is somewhat difficult to do because of the lack of clarity about whether the gun was Slaughter's), we think the proper analysis is to recognize that the trial court here most likely ruled as it did simply in following the long tradition of allowing evidence of the circumstances surrounding and attendant to the incident in question so that the factfinder is allowed to know the entire context of an event.[2] And here it appears the trial court did have a proper reason for admitting it, presumably basing its ruling on the theory of providing the jury with all the facts and circumstances surrounding the event. *See, e.g., State v. Davis,* 226 S.W.3d 167, 170 (Mo.App.2007). "This evidence is admissible to present a complete and coherent picture of the criminal events that transpired." *Id.* "Generally, acts, statements, occurrences and the circumstances forming part of the main transaction may be shown in evidence under the *res gestae* rule where they precede the offense immediately or by a short interval of time and tend, as background information, to elucidate a main fact in issue." *Id.* at 170–71.

The term *"res gestae"* includes [t]hings done, or . . . the facts of the transaction; . . . the surrounding facts of a transaction explanatory of an act or showing a motive for acting; . . . matters incidental to a main fact and explanatory of it, including acts and words which are so closely connected with a main fact as will constitute a part of it, and without a knowledge of which the main fact might not be properly understood.

*Id.* at 171. The rationale behind all of the exceptions is to admit evidence that will legitimately help the jury determine the facts. *See State v. Payne,* 135 S.W.3d 504, 507 (Mo.App.2004).

Numerous cases allow evidence of other misconduct to be admitted as part of the entire context of an event. *See, e.g., id.* at 505–08 (defendant charged with three robberies; evidence of fourth robbery committed during the same spree was admissible); *State v. Morrow,* 968 S.W.2d 100, 107 (Mo. banc 1998) (evidence of other uncharged crimes admissible where crimes were "part of a three day drug binge and crime spree," to "fully and fairly [present] a complete and coherent picture of the . . . whole truth to the jury"); *State v. Jordan,* 937 S.W.2d 262, 267–68 (Mo.App.1996) (defendant charged with murder and armed criminal action; a few days before the shooting, the defendant was arrested for driving while intoxicated and he had four loaded firearms on the seat next to him; court found that evidence of the DWI arrest "was merely a circumstance surrounding the evidence [the firearms used in the shooting]"); *State v. Harris,* 870 S.W.2d 798, 810 (Mo. banc 1994) (the evidence of "[the defendant's] planned use of the gun to commit a drive-by shooting was inter-

---

**2.** We note, for instance, that the court, in ruling on the admissibility of evidence of the defendant's drug usage around the time of the rape, stated that the evidence should be admitted because it was "contemporary with the whole thing." This is consistent with our general belief that trial judges are often alert to the concept of admitting "res gestae" evidence to provide the jury with the entire set of contemporaneous circumstances of an event even when one or more of such circumstances may place the defendant in a negative light.

connected to and nearly contemporaneous with" the murder for which he was on trial; "it set the context for that offense" and "added to the complete and coherent picture of the murder"); *State v. Davis*, 806 S.W.2d 441, 443 (Mo.App.1991) (testimony that defendant, who was charged with possession of a controlled substance, had engaged in other drug transactions during surveillance "established the *res gestae* of the crime with which defendant was charged"; and such evidence "furnished a cohesive picture" of the charged offense).

Evidence that Gabbert saw what might have been a gun in the room where Slaughter directed her to sleep and where she was raped was admissible as part of the context of the assault. It was part of her complete story and helped give the jury "a clearer understanding of the whole criminal episode." *See* David P. Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events,* section 5.3.2, p. 341 (2009).

We do not mean to say that the court did not have *any* discretion to deny admission to the evidence of the gun handle if the court believed such evidence would have been likely to mislead the jury. However, we conclude that the evidence of the gun handle was reasonably admitted by the trial court as part of the circumstances of the event.

The "res gestae" rule allows each party freedom to argue the known facts for whatever inferences they might yield. The State here attempted to suggest that Slaughter might have placed a gun under the "tip" of the bed where the victim could see it at some time, so that the victim would supposedly be reluctant to strongly resist, or perhaps later be reluctant to make a police report. The defense, on the other hand, could have argued that the fact that Slaughter never threatened Gabbert with a gun or specifically referred to a gun in talking to her, and the fact that he allowed Gabbert access to the gun, were all consistent with the notion that there was *consensual* sexual activity between the two. The jury might also wonder if Slaughter would have placed a gun (if loaded) where it would be accessible to Gabbert if he were intending to rape her (because she might grab the gun and kill Slaughter in self-defense). The defense could thus have argued that Gabbert's observation of the presence of the gun handle actually was inconsistent with Slaughter's guilt of rape. And then also, it seems to us that it might be quite likely that the jury concluded that the observation of the gun handle, which was never directly connected to the defendant, did not prove much of anything.

We know that there was sexual contact between Gabbert and Slaughter. The issue was whether it was rape. The gun was one small factor among many that the jury could consider in answering the question of whether Gabbert was telling the truth when she said that it was rape. The jurors were required to carefully evaluate the testimony and *all* the surrounding circumstances to determine whether they were convinced beyond a reasonable doubt of the truth of the rape accusation. The trial court did not abuse its discretion in admitting evidence of the apparent gun handle because it was part of the circumstances surrounding the crime.

### Conclusion

The judgment is affirmed.

HARDWICK, P.J., and AHUJA, J. concur.