

# In the Missouri Court of Appeals
# Eastern District

## DIVISION ONE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED112523 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | 2122-CR00264-01 |
| | ) | |
| RONALD S. MARR, | ) | Honorable Paula P. Bryant |
| | ) | |
| Appellant. | ) | Filed: May 6, 2025 |

Before James M. Dowd, P.J., Angela T. Quigless, J., and Cristian M. Stevens, J.

## OPINION

In this criminal case, the jury found Ronald Marr guilty on three counts of first-degree murder and three counts of armed criminal action (ACA) for the murders of K.H. and her two young daughters, Jo.H. and Ja.H. The court sentenced Marr to life in prison without the possibility of parole for each murder and fifteen years for each ACA conviction. The court ordered the ACA sentences to run consecutively to each murder sentence.

Marr now appeals asserting that the trial court abused its discretion in allowing the State to present evidence of Marr's prior bad acts or uncharged criminal conduct concerning disturbances that occurred at the victims' residence on February 2, two days before the murders, because it constituted propensity evidence that was not logically or legally relevant. The disputed evidence included: (1) testimony from victims' neighbors; (2) the neighbors' doorbell

camera footage; and (3) a police officer's testimony and body-camera footage. Marr also claims the same regarding testimony from Marr's ex-girlfriend about Marr's threats to her and his threats to victim K.H. We affirm because the evidence from February 2 and Marr's threats to ex-girlfriend about K.H. fit into several exceptions and although ex-girlfriend's testimony about threats to her was likely inadmissible, Marr has failed to show that it was outcome-determinative.

## Background

In February 2021, victim K.H. lived on the ground floor of a two-family, two-story duplex with her two young daughters, eight-year-old victim Jo.H, and one-year-old victim Ja.H. Marr was Ja.H's father. Victim K.H. and Marr had known each other for several years and had been in a relationship during many of them.

On the evening of February 2, 2021, victim K.H.'s upstairs neighbor, L.F., received several notifications on his smartphone from his doorbell camera. When he accessed the camera on his phone, he saw Marr pacing in front of both apartments' front doors and then heard Marr bang on victim K.H.'s door and scream threats to K.H. including threats about the children. Neighbor L.F. became concerned and called the police. At trial, the State played for the jury L.F.'s 911 call and footage from the doorbell camera.

When police arrived, they observed Marr standing on the front porch. Marr told police he lived there, and he wanted to see his daughter. K.H. told the police that Marr did not live there and that he was acting "crazy" because he had been served with papers to take a DNA paternity test for victim Ja.H. for child support purposes. She also told police that she had let him in her home earlier but after he became angry and he scared the children, she asked him to leave. After speaking with the officers, Marr left at their request but returned a few minutes later and told the officers he wanted to see his daughter and to retrieve some of his possessions from

2

the home. K.H. allowed Marr into her home with the police present. Marr and K.H. began to argue so the police again told him to leave, which he did. Then, around 10 p.m. according to the neighbors' testimony, Marr returned and again banged on K.H.'s front door. L.F.'s wife, Q.F., called the police. Different officers responded, and Marr again left. At trial, the State presented the initial responding officer's testimony and his body camera footage.

Witness A.M., who was pregnant with Marr's child at the time the murders occurred and who knew victim K.H., testified that Marr called her multiple times on February 2. Initially, Marr was calm and collected, but that evening he became increasingly angry and upset. A.M. knew about the upcoming paternity test and knew Marr was angry about paying child support. He yelled obscenities at A.M. and told her that she and their unborn son were going to die that night. He also said K.H. was going to die that night. A.M. did not have any further contact with Marr leading up to the murders. A.M. did not report Marr's threats to the police.

Neighbor L.F. then testified that the next day he heard and recognized Marr's voice coming from K.H.'s home and that the conversation seemed "normal." For her part, Q.F. testified that on the following morning, February 4, she woke to children's cries emanating from K.H.'s bedroom below. Then she heard K.H. shout, "You need to leave" before hearing three gunshots "back-to-back" followed by complete silence.

Q.F. called the police. L.F. woke up to his wife on the phone with police and then he sat at their window awaiting their arrival. After twenty minutes, Q.F. called the police again. During this phone call, L.F., still at the window, saw Marr leave which was approximately twenty-five minutes after Q.F. had heard the gunshots.

Police arrived a few minutes after Marr's departure and found K.H., Jo.H., and Ja.H. all slain by gunshots in K.H.'s bedroom. A police detective collected a recently-discarded cigarette

3

butt floating in the toilet that later tested positive for Marr's DNA. The detective also found correspondence from the Missouri Department of Social Services' Family Support Division summoning victim Ja.H to appear for a paternity test four days later on February 8, 2021.

Later that day, police learned that Marr had boarded a Greyhound bus headed to Illinois under the alias "John Jones." When police arrested Marr at a gas station in Effingham, Illinois, Marr told them, unprompted, that he had heard about a shooting in St. Louis and that he intended to speak to police about it. Later, at the jail in Effingham, Marr told a corrections officer, "I f***ed up." And during Marr's first court appearance the next day, which Marr attended over video conference from the jailhouse conference room, Marr attempted to flee.

The jury found Marr guilty on all six counts, the three first-degree murder charges and the three armed criminal action charges. The court sentenced Marr to a life sentence without the possibility of parole and 15 years for the ACA convictions, with each ACA sentence to be served consecutively to the corresponding murder sentence. This appeal follows.

## Standard of Review

A trial court has broad discretion to admit or exclude evidence. *State v. Simmons*, 515 S.W.3d 769, 774 (Mo. App. W.D. 2017). Thus, we review a trial court's decision regarding the admission or exclusion of evidence for an abuse of discretion. *State v. Wood*, 580 S.W.3d 566, 574 (Mo. banc 2019). A trial court abuses its discretion where its ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *State v. Butler*, 642 S.W.3d 364, 369 (Mo. App. E.D. 2022). If reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *Id.* This Court reviews "for prejudice, not mere error, and will reverse only if the error was so prejudicial

that it deprived the defendant of a fair trial." *State v. Forrest*, 183 S.W.3d 218, 223-24 (Mo. banc 2006).

## Discussion

The trial court did not abuse its discretion in admitting the evidence from February 2 because none of it was inadmissible propensity evidence; rather, the evidence was admitted for numerous valid reasons including to prove Marr's identity, motive, intent, animus, and to provide the jury a complete picture of the circumstances surrounding the charged crimes. Marr's threats about victim were also logically and legally relevant for the same reasons. Marr's threats to his ex-girlfriend were likely not relevant, but Marr has failed to show that her testimony was outcome-determinative.

"Evidence of prior uncharged bad acts is inadmissible for the sole purpose of showing the defendant's propensity to commit such acts." *State v. Whitaker*, 405 S.W.3d 554, 559 (Mo. App. E.D. 2013). But, prior misconduct by the defendant is admissible if the evidence is logically and legally relevant in that its probative value outweighs its prejudicial effect. *State v. Key*, 437 S.W.3d 264, 270 (Mo. App. W.D. 2014) (quoting *State v. Burns*, 978 S.W.2d 759, 761 (Mo. banc 1998)). Logical relevance is evidence that makes a material fact either more or less probable. *State v. Miller*, 208 S.W.3d 284, 287 (Mo. App. W.D. 2006). Legal relevance weighs the probative value of the evidence against its costs – unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness. *State v. Sladek*, 835 S.W.2d 308, 314 (Mo. banc 1992). Evidence is logically relevant if it goes to "(1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related ... that proof of one tends to establish the other; or (5) the identity of the person charged with commission of the crime on trial." *State v. Primm*, 347 S.W.3d 66,

70 (Mo. banc 2011). "This list of exceptions is not exhaustive." *State v. Barriner*, 34 S.W.3d 139, 144 (Mo. 2000).

Several other exceptions to the propensity evidence rule exist. For example, the court may admit "evidence of uncharged crimes that are part of the circumstances or the sequence of events surrounding the offense charged." *State v. Harris*, 870 S.W.2d 798, 810 (Mo. banc 1994). Moreover, "'[g]enerally, acts, statements, occurrences, and the circumstances forming the main part of the transaction may be shown in evidence under the *res gestae* rule where they precede the offense immediately or by a short interval of time and tend, as background information, to elucidate a main fact in issue.'" *State v. Slaughter*, 316 S.W.3d 400, 404 (Mo. App. W.D. 2010) (quoting *State v. Davis*, 226 S.W.3d 167, 170 (Mo. App. W.D. 2007)).

I.     *The Testimony and Audio-Video Footage from February 2*

We first consider and reject Marr's claim as to the February 2 evidence consisting of the testimony from the upstairs neighbors and from the responding police officer, and the audio-visual recordings from the doorbell camera and from the officer's body camera. We address his claim as to A.M.'s testimony below.

First, regarding the neighbors' testimony and the doorbell camera footage, neighbor L.F.'s testimony that he saw Marr banging on the door and yelling at K.H. was corroborated by the doorbell camera's recording and was admissible because it painted a complete picture of the circumstances surrounding the murders. *Primm*, 347 S.W.3d at 70. In other words, this evidence showed the relationship between Marr and K.H. and went to why Marr was angry at her.

This evidence also went to motive, animus, and identity. As for motive and animus, the video showed Marr's anger at the specter of owing child support and that murdering the victims

6

would dispense with that obligation. *See State v. Patterson*, 847 S.W.2d 935, 938 (Mo. App. E.D. 1993). As for identity, the doorbell camera footage established that Marr was at K.H.'s apartment and that L.F. recognized Marr leaving the apartment on the morning of the murders because of the February 2 footage he saw.

Second, the police officer's testimony and the body-camera footage from February 2 also fits into the "complete picture" exception since K.H. and Marr spoke to police about the upcoming paternity test. *See State v. Johnson*, 207 S.W.3d 24, 42 (Mo. banc 2006). Moreover, the testimony and body-camera video showed Marr's motive, animus, and identity for the reasons already stated above.

## II. *A.M.'s Testimony re Marr's Threats to A.M.*

In his second point, Marr claims that witness A.M.'s testimony about the violent threats Marr made to her was inadmissible and prejudicial propensity evidence that was not logically or legally relevant. While we agree that the testimony was likely inadmissible, Marr has failed to show that the evidence was outcome-determinative and, thus, no prejudice resulted. *State v. Adams*, 350 S.W.3d 864, 866 (Mo. App. E.D. 2011)

This Court will reverse a conviction for error in admitting evidence only if the admission was so prejudicial as to be outcome-determinative, i.e., that when considered with and balanced against the other evidence, there was a reasonable probability that the jury would have acquitted but for the erroneously-admitted evidence. *Id.* (citing *Johnson*, 207 S.W.3d at 42)). Improperly admitted evidence is outcome-determinative when its admission had "an effect on the jury's deliberations to the point that it contributed to the result reached." *Barriner*, 34 S.W.3d at 151. Thus, "[a]bsent a showing that the evidence inflamed the jury or diverted its attention from the issues to be resolved, admitted evidence, even if immaterial or irrelevant, will not constitute

prejudicial error." *State v. Stoner*, 907 S.W.2d 360, 364 (Mo. App. W.D. 1995). Mere allegations of prejudice are insufficient to meet this burden. *Id.*

A.M.'s testimony is comparatively minuscule next to the vast amount of properly admitted and damning evidence presented by the State including Marr's threats to K.H., the doorbell camera video, the police body-camera footage, testimony from the officers who responded on February 2, testimony from the neighbors regarding February 2 and February 4, physical evidence found at the crime scene, Marr's incriminating statements after his arrest, Marr's attempt to flee Missouri under an alias, and Marr's attempt to flee the Effingham jail after being arrested. Thus, Marr has failed to show that A.M.'s testimony had such an effect on the jury's deliberations that it changed the outcome of their decision. *Barriner*, 34 S.W.3d at 151. Point denied.

### III. *A.M.'s Testimony re Marr's Threats against victim K.H.*

Lastly, we address Marr's claim that the trial court abused its discretion in admitting A.M.'s testimony that during her telephone conversations with Marr on February 2, he threatened victim K.H. We find no error because the testimony about his threat against K.H. was logically and legally relevant in that it went to Marr's animus against her and his intent to kill her. Moreover, the evidence was not admitted to prove Marr's disposition or propensity to commit murder generally, but to prove his guilt for *these* murders specifically.

Marr concedes that the threats against K.H. "may have borne some logical relevance to the events of February 4" and we agree with his assessment. The threats show Marr's intent to kill and his murderous animus towards Victim. *State v. Austin*, 411 S.W.3d 284, 294 (Mo. App. E.D. 2013). The evidence also provided the jury with a "complete and coherent picture of the events that transpired" during this short window leading up to the crimes, in that Marr was angry

8

with K.H. on February 2 and two days later, he murdered her. *State v. Madrigal*, 652 S.W.3d 748, 774 (Mo. App. E.D. 2022). And, we find that the threats were legally relevant in that the probative value greatly outweighed the prejudice to Marr, especially since a defendant's history of violent or threatening conduct towards victim in adult abuse cases can be especially probative of guilt. *Whitaker*, 405 S.W.3d at 559.

Finally, these threats were not admitted to show merely that Marr had "bad character" and a disposition to murder generally. Rather, the threats helped prove that Marr was guilty of *these specific crimes*. *State v. Yust*, 675 S.W.3d at 613 (quoting *State v. Whitman*, 788 S.W.2d at 337) ("[I]f it is relevant to prove the defendant's guilt of the particular crime of which he is being tried, and not merely to show the defendant's bad character or his disposition to commit the crime, the evidence of the separate crimes is admissible."). These well-established exceptions to propensity evidence apply here and therefore the court did not abuse its discretion.

## Conclusion

For the reasons set forth above, we affirm.

James M. Dowd, P.J.

Cristian M. Stevens, J. and
Angela T. Quigless, J. concur.

9